848 So.2d 203 (2003)
Clarence Troy WATSON a/k/a Glenn Lavel Bension, Appellant,
v.
STATE of Mississippi, Appellee.
No. 2001-KA-01829-COA.
Court of Appeals of Mississippi.
June 17, 2003.
*205 Tom Sumrall, attorney for appellant.
Office of the Attorney General by Scott Stuart, attorney for appellee.
Before KING, P.J., THOMAS, IRVING and CHANDLER, JJ.
IRVING, J., for the court.
¶ 1. Clarence Troy Watson was found guilty by a Harrison County jury of the crime of forcible rape. The trial judge sentenced Watson to twelve years in the custody of the Mississippi Department of Corrections. Watson filed a post-trial motion for a JNOV, or in the alternative, for a new trial. This motion was denied, and Watson has appealed. He argues on appeal that his right to a speedy trial was violated and that the evidence is insufficient to support the verdict. He also argues that the verdict of the jury is against the weight of the evidence.
¶ 2. Finding no reversible error, this Court affirms the trial court's judgment.

FACTS
¶ 3. Watson worked at a hair salon as a custodian. Jane Moore[1] worked as a cosmetologist *206 at the same salon. Moore testified that on October 10, 1997, she had run out of hair product supplies and that she was awaiting a delivery at that time. Watson informed Moore that he had a neighbor who had some hair product supplies that she could purchase. Moore went with Watson to his apartment and waited there while Watson went to get his neighbor. Watson returned to the apartment without the neighbor. He informed Moore that there was no neighbor who sold hair product supplies. Watson then attacked Moore from behind by grabbing her throat. Moore struggled, and the more she struggled the harder Watson pressed her throat. Moore then stopped struggling because he was hurting her and she could no longer breath.
¶ 4. Watson then moved Moore to the floor and sat on her chest while he removed her clothes. Moore asked Watson why was he attacking her. She was afraid for her life because Watson had made threats that he would kill her. Watson made actions like he was looking for a gun within the couch cushions. Moore thought Watson was crazy and mad. She tried to reason with him by telling him she would not tell anyone what happened between them and to just let her go back to work. Watson then tried to put his penis inside Moore while she scooted away from him. Moore testified that when it was all over with, she and Watson had sexual intercourse and Watson performed oral sex.
¶ 5. Moore returned to the hair salon and later so did Watson. Moore still feared that Watson would kill her and that he was possibly carrying a gun. Moore was so fearful and upset that she stepped outside the hair salon. Her co-workers testified that they noticed Moore's strange behavior and followed her outside to ask what was wrong. She confided in the hair salon's owner, Howard Pickens, and told him what had happened between her and Watson. Pickens then took Moore to the hospital where the staff performed a rape kit on her.
¶ 6. Understandably, Watson's version of events differs from Moore's. Watson testified that he and Moore went out on numerous occasions and that they had a consensual sexual relationship. Watson testified that on the day in question, he and Moore left the hair salon to have lunch together and sex at his apartment. Watson admits that he and Moore had sexual intercourse that day but denies that he used any force or threatened to kill Moore. Watson suggested that Moore charged him with rape after an argument that they had concerning his girlfriend. Watson testified that Moore was upset because she wanted him to end his relationship with his girlfriend so they could be alone in a relationship. Watson refused.
¶ 7. While Moore was in the hospital being examined and tested for rape, Watson was in the same hospital visiting his girlfriend who was a patient. Pickens testified that he saw Watson in the hospital, and he also saw Watson flee police and hospital security when they tried to approach him.
¶ 8. Watson was arrested on October 17, 1997, for the forcible rape of Moore. On March 31, 1998, Watson was indicted and on May 18, 1998, Watson waived arraignment and entered a plea of not guilty. Subsequently, various continuances were granted at the behest of both sides, as well as at the behest of the trial court acting sua sponte. The trial commenced on January 11, 2000. Other pertinent facts will be related during the discussion of the issues.

ANALYSIS AND DISCUSSION OF THE ISSUES

1. Denial of Speedy Trial
¶ 9. Allegations of speedy trial violations are examined and determined on *207 a case-by-case basis due to the factual specifics of each action. Brengettcy v. State, 794 So.2d 987, 991(¶ 7) (Miss.2001). A defendant's right to a speedy trial is secured by the Sixth and Fourteenth Amendments to the United States Constitution and by Article III, Section 26 of the Mississippi Constitution of 1890. Giles v. State, 650 So.2d 846, 850 (Miss.1995). A chronology of the relevant dates in the case are as follows:
Oct. 17, 1997 Watson arrested
Mar. 31, 1998 Watson indicted
May 18, 1998 Waiver of Arraignment; Entry of Not Guilty Plea. Trial set for August 3, 1998.
Jul. 29, 1998 Motion for Continuance requested by defense attorneydefense attorney not ready. Order issued that granted the continuance and reset the trial for November 2, 1998.
Aug. 28, 1998 Motion and Order for Continuance requested and granted by the trial courtassigned judge not available week of 11/2/1998 due previously set civil trial. Trial reset for December 7, 1998.
Nov. 25, 1998 Motion to Dismiss, filed pro se

Dec. 7, 1998 Motion and Order for Continuance requested by the State DNA pending with crime lab. Trial reset for March 8, 1999.
Mar. 8, 1999 Motion and Order for Continuance requested by the State crime laboratory results not complete. State motions to send evidence to another crime laboratory. Trial reset for May 10, 1999.
Jun. 8, 1999 Motion to Dismiss, filed pro se

May 13, 1999 Motion for Continuance requested by the trial courtcourt tried civil case. Trial reset for September 7, 1999.
Aug. 20, 1999 Motion and demand for Speedy Trial, filed pro se

Sept. 13, 1999 Order denying Watson's motion to dismiss for failure to grant a speedy trial.
Sept. 17, 1999 Motion for Continuance requested by the defense attorney defense attorney not available and engaged in trial in chancery court. Trial reset for November 15, 1999.
Sept. 27, 1999 Order explaining that the trial was previously set to begin the week of September 8, 1999, but due to a short week due to the Labor Day holiday, the court announced that no trial would be conducted and the defense agreed to roll matter over to September 13, 1999, for trial. The order also stated that on September 13, 1999, defense requested continuance and trial was reset.
Oct. 15, 1999 Demand for Speedy Trial, filed pro se

Oct. 18, 1999 Motion to Dismiss-Right to Speedy trial violation, filed pro se

Nov. 19, 1999 Motion and Order for Continuance requested by the trial courtcase not reached for trial due to ongoing civil trial. Trial reset for January 10, 2000.
Dec. 13, 1999 Demand for Speedy Trial, filed pro se

Jan. 4, 2000 Motion to Dismiss, filed pro se

Jan. 11, 2000 Trial begins
¶ 10. The constitutional right to a speedy trial attaches at the time of a formal indictment, information, or arrest. Birkley v. State, 750 So.2d 1245, 1249 (¶ 11) (Miss.1999). In reviewing a constitutional challenge, a Mississippi appellate court does not set a specific length of time as being per se unconstitutional, but instead a four-part balancing test articulated *208 by the U.S. Supreme Court in Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), is applied to determine if the right to speedy trial has been denied. Smith v. State, 550 So.2d 406, 408 (Miss. 1989). The four Barker factors to consider are: (1) length of delay, (2) reason for delay, (3) the defendant's assertion of his right to a speedy trial, and (4) the prejudice to the defendant. Barker, 407 U.S. at 530, 92 S.Ct. 2182. No one of the Barker factors is in itself dispositive, rather a totality of the circumstances is used. Jefferson v. State, 818 So.2d 1099, 1106 (¶ 11) (Miss.2002). "Nor is the balancing process restricted to the Barker factors to the exclusion of any other relevant circumstances." McGhee v. State, 657 So.2d 799, 802 (Miss.1995).

The length of the delay
¶ 11. The Barker analysis begins with the first factor, length of delay, which operates as the triggering mechanism. Birkley, 750 So.2d at 1249 (¶ 13). In this case, we must calculate the delay from the date of arrest. Watson was arrested on October 17, 1997, and trial did not commence until January 11, 2000. Therefore, the delay at issue between the arrest and the trial is 817 days. Mississippi case law establishes that a delay of eight months or longer is presumptively prejudicial. Birkley, 750 So.2d at 1249 (¶ 14); State v. Ferguson, 576 So.2d 1252, 1254 (Miss. 1991). Since this delay is longer than eight months, an analysis of the other Barker factors is required to resolve Watson's denial of speedy trial issue.

The reason for the delay
¶ 12. The second Barker factor requires a determination of the reason for the delay and the party to whom it is attributable. Delays that are attributable to one party count against that party. Brengettcy, 794 So.2d at 993 (¶ 13). The risk of "non-persuasion rests with the prosecution," and where the record is silent as to the cause of delay, this factor must weigh in favor of the defendant. Id. Any delays in prosecution attributable to a defendant tolls the running of time. Handley v. State, 574 So.2d 671, 674 (Miss. 1990). In Mississippi, continuances granted to the defendant not only toll the time but should be deducted from the total number of days considered in the Barker analysis. Flores v. State, 574 So.2d 1314, 1318 (Miss.1990). Any continuances for "good cause" will toll the running of time, and those dates are not counted against the State. Id.
¶ 3. At least 289 days elapsed between the date of Watson's arrest and the date of his first trial setting on August 3, 1998. Thereafter, a number of continuances in this matter were ordered at the behest of both the prosecution and the defense, as well as the court acting sua sponte.
¶ 14. The record is silent as to why the case was not set for trial prior to August 2, 1998. The record does indicate that Watson had new counsel substituted on April 3, 1998. However, the record is silent as to the reason for the substitution. Also, it does not appear that the substituted counsel was retained by Watson since, in the order allowing the substitution, the substituted counsel is referred to as a voluntary contract criminal defender.
¶ 15. On July 29, 1998, Watson's attorney requested a continuance of the August 3 trial date, and the case was reset for trial on November 2, 1998. From August 3, 1998, to November 2, 1998, is ninety-one days. Since Watson's attorney requested this continuance, these days are charged against Watson and deducted from the 817 days involved.
¶ 16. On August 28, 1998, the trial court sua sponte ordered a continuance for good cause since the assigned judge was not *209 available the week of November 2, 1998, due to a previously-set civil trial. Watson's trial was reset for December 7, 1998. From November 2, 1998, to December 7, 1998, is thirty-five days.
¶ 17. The supreme court has recognized that some continuances are granted because of overcrowded dockets and understaffed prosecutors, and in these cases this Barker factor will not be weighed heavily against the State. McGhee, 657 So.2d at 802. "What should therefore be obvious is that if a shortage of prosecutorial staff can be good cause for delay, surely shortage of judges is an equally good cause shown." Id. at 803. Furthermore, the supreme court has held that the preempting of a trial by another case constitutes good cause. Id.
¶ 18. On December 7, 1998, the State requested a continuance because the DNA tests were pending with the crime laboratory. The trial judge found good cause existed for this continuance and reset the trial for March 8, 1999. From December 7, 1998, to March 8, 1999, is ninety-one days.
¶ 19. On March 8, 1999, the crime laboratory results still were not complete. The State requested a continuance and moved to send the DNA evidence to another laboratory. The trial court found good cause and continued the trial to May 10, 1999. However, the trial did not take place on this date, and the record reflects that on May 14, 1999, the trial court entered an order sua sponte resetting the case for trial on September 7, 1999. The order indicated that the case was not tried at the scheduled time because the trial court tried a civil case during that time. From March 8, 1999, to September 7, 1999, is 183 days.
¶ 20. The record reflects that on September 27, 1999, the trial judge entered an order wherein he explained that the week of September 8, 1999, was a short week due to the Labor Day holiday and that no trials were conducted during that week. The order also reflects that the defense attorney agreed to continue the matter for trial on September 13, 1999. The order further reflects that on September 13, the State announced ready for trial but that the defense attorney requested a continuance because of a previously-scheduled trial in the chancery court. The order reset the case for trial on November 15, 1999. However, because of an ongoing civil case, Watson's trial did not take place, and the trial court, on its on motion, continued the case to the next available date which was January 10, 2000. However, the trial did not commence until January 11, 2000.
¶ 21. From September 7, 1999, to January 11, 2000, is 126 days. Of this number, sixty-nine days are chargeable to Watson. This number is arrived at by adding the six days involved in the agreed continuance from September 7 to September 13 and the sixty-three days of delay resulting from the continuance, which Watson requested, from September 13 to November 15.
¶ 22. A recapitulation of the accounting shows that of the 817 days occurring between the date of Watson's arrest and the date of his trial, only 160 days are clearly chargeable to him. Of the remaining 657 days, the trial court found good cause existed for delays totaling 366 days, leaving 291 days for which no explanation has been provided.
¶ 23. A finding of good cause is a finding of ultimate fact, and should be treated on appeal as any other finding of fact; it will be left undisturbed where there is in the record substantial credible evidence from which it could have been made. Walton v. State, 678 So.2d 645, 648-49 (Miss.1996). Although the record *210 reflects that good cause existed for a substantial portion of the delay in bringing Watson to trial, we conclude that this factor weighs in Watson's favor.
The assertion of the right to a speedy trial
¶ 24. The third Barker factor to consider is whether Watson asserted his right to a speedy trial before the actual trial on January 11, 2000. Watson had no duty to bring himself to trial, yet the Mississippi Supreme Court has found that the defendant "gains far more points under this prong of the Barker test where he has demanded a speedy trial." Brengettcy, 794 So.2d at 994(¶ 17) (citing Jaco v. State, 574 So.2d 625, 632 (Miss.1990)). Mississippi case law also differentiates a demand for a speedy trial as being distinct from a demand for dismissal due to violation of the right to a speedy trial. Id.
¶ 25. The record reflects that Watson filed three separate pro se demands for a speedy trial. Watson first asserted and demanded his right to a speedy trial four months before his trial on August 20, 1999. On September 13, 1999, the trial court entered an order denying the defendant's motion to dismiss for failure to grant a speedy trial. The trial court remarked that after reviewing the file and hearing the arguments of counsel, it found that there had been no violation of Watson's constitutional or statutory speedy trial rights. Shortly thereafter, on October 15, 1999, Watson again filed a demand for his right to a speedy trial. A few days later on October 18,1999, Watson filed a motion to dismiss for violation of his constitutional and statutory rights to a speedy trial. As prejudice, Watson asserted presumptive prejudice by the length of the delay; interference with his liberty; disruption of his employment; drain of financial resources; curtailment of his associations; his subjugation to public obloquy; and creation of anxiety in himself, his family and his friends. Without waiting for the decision of the trial judge on his motion to dismiss, the record shows that Watson demanded his right to a speedy trial again on or around December 13, 1999. The State concedes that this Barker factor weighs against the State and in Watson's favor. We agree.

Prejudice to the defendant
¶ 26. The final prong of the Barker analysis, prejudice to the defendant, has two aspects: (1) actual prejudice to the accused in defending his case and, (2) inordinate delay. Atterberry v. State, 667 So.2d 622, 627 (Miss.1995). "There are three examples of prejudice which an accused may suffer because of the delay: (1) oppressive pretrial incarceration, (2) anxiety and concern of the accused, and (3) impairment of the defenses." Id. Watson is not required to put forth an affirmative showing of prejudice to prove his right to a speedy trial has been violated. Id. Nevertheless an absence of prejudice weighs against a finding of a violation. Id.
¶ 27. Watson has not demonstrated any actual prejudice that he has experienced. The extremely lengthy delay in Watson's case presents presumptive prejudice only. However, on appeal, Watson asserts not only presumptive prejudice but actual prejudice as well. Watson contends that he had three witnesses who would have been able to testify at the time of his arrest that he and the victim had a consensual sexual relationship.
¶ 28. The unavailability of witnesses as actual prejudice has been presented and reviewed by the supreme court in several cases. For instance, in Rhymes v. State, 638 So.2d 1270 (Miss.1994), the supreme court rejected the argument that the defendant was prejudiced by the inability to call the victim's brother as a witness because *211 there was no proof that the defendant had secured the witness prior to trial and lost him due to the delay, and there was no proof that the defendant had attempted to secure his appearance by subpoena. Id. at 1274.
¶ 29. The argument made by Watson concerning the unavailability of the witnesses was raised by Watson for the first time in the hearing on his post-trial motion. He did not cite the absence of the witnesses as prejudice when he filed his motion to dismiss for denial of a speedy trial in October 18, 1999. At the hearing on Watson's motion for a new trial, Watson's trial attorney testified that he had no recollection of a discussion of witness testimony with Watson, nor had he requested that any witnesses be subpoenaed. This denial by Watson's trial attorney of any witness testimony regarding an ongoing sexual relationship between Watson and Moore refutes the actual prejudice asserted by Watson. Thus this assertion regarding the unavailability of witnesses lacks merit.
¶ 30. Watson has not shown any actual prejudice that he has suffered in the defense of his case nor has he shown this Court that there has been an interference with his liberty. Therefore, this factor cannot weigh in his favor. Without a showing of actual prejudice, Watson is left with only presumptive prejudice. "Where the delay is neither intentional or egregiously protracted, and where there is no showing of actual prejudice, the balance is struck in favor of rejecting the defendant's speedy trial claim." Rhymes, 638 So.2d at 1275.
¶ 31. Having reviewed all the Barker factors, based on the facts of this case, and considering the totality of the circumstances, we conclude that Watson was not denied his constitutional right to a speedy trial. In reaching this conclusion, we are mindful that Watson did demand a speedy trial on three separate and distinct occasions. However, his first demand was made a little less than five months before his trial. During the nearly five months that elapsed after his demand was made, the trial court found good cause existed for the entire delay. In fact, after Watson filed his pro se motion for a speedy trial on August 20, 1999, his trial counsel sought and obtained a delay of the trial which was set for September 13, 1999, just twenty-three days after Watson's demand for a speedy trial. Given these facts, and especially the fact that Watson has failed to demonstrate any actual prejudice, we find that the trial court did not err in denying Watson's motion to dismiss for violation of his constitutional and statutory right to a speedy trial.

2. Sufficiency and Weight of the Evidence
¶ 32. Watson argues that he should have been granted a directed verdict at the conclusion of the State's case and that he should have likewise been granted a JNOV after the jury's verdict due to the legal insufficiency of the evidence. Watson further argues that he should have been granted a new trial because the jury's verdict was against the overwhelming weight of the evidence.
¶ 33. In challenges to the sufficiency of evidence, the standard of review requires that the evidence be considered in the light most favorable to the State and that all credible evidence consistent with Watson's guilt be accepted as true. McRee v. State, 732 So.2d 246, 249(¶ 9) (Miss.1999). In reviewing a claim of insufficient evidence, an appellate court must review all of the evidence in the light most consistent with the jury's verdict. Smith v. State, 802 So.2d 82, 85(¶ 10) (Miss.2001). The prosecution is given the benefit of all *212 favorable inferences that may be reasonably drawn from the evidence. Id. "If the facts and inferences so considered point in favor of the accused with sufficient force that reasonable men could not have found beyond a reasonable doubt that he was guilty, reversal and discharge are required." Mangum v. State, 762 So.2d 337, 341(¶ 11) (Miss.2000). If the evidence is found to be legally insufficient, then discharge of the defendant is proper. McRee, 732 So.2d at 249(¶ 9).
¶ 34. As distinguished from a JNOV, a motion for a new trial asks this Court to vacate the judgment on grounds related to weight of the evidence, not sufficiency of the evidence. An appellate court's standard of review for claims that a conviction is against the overwhelming weight of the evidence is as follows:
[This court] must "accept as true the evidence which supports the verdict and will reverse only when convinced that the circuit court has abused its discretion in failing to grant a new trial." A new trial will be not be ordered unless the verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction "unconscionable injustice."
Smith, 802 So.2d at 85-86(¶ 11) (citing Crawford v. State, 754 So.2d 1211, 1222(¶ 30) (Miss.2000)). Matters regarding the weight and credibility of the evidence are to be resolved by the jury. McRee, 732 So.2d at 249(¶ 9).
¶ 35. In other words, Watson's insufficiency of the evidence argument is a question of pure law and is directed to the trial court's denial of his post-trial motion for JNOV, while his argument that the verdict was against the overwhelming weight of the evidence is directed to the trial court's denial of his motion for a new trial and addresses the sound discretion of the trial court. Collier v. State, 711 So.2d 458, 461-62 (¶ 13) (Miss.1998). As such, a greater quantum of evidence favoring the State is necessary for the State to withstand a challenge that the verdict is contrary to the overwhelming weight of the evidence, as distinguished from the legal sufficiency of the evidence argument. Id. Under our established case law, the trial judge should set aside a jury's verdict only when, in the exercise of his sound discretion, he is convinced that the verdict is contrary to the substantial weight of the evidence. Pearson v. State, 428 So.2d 1361,1364 (Miss. 1983).
¶ 36. Watson attacks the credibility of the evidence primarily through the victim's testimony. Specifically, Watson explains that Moore's testimony is ambiguous in regards to sexual penetration and the use of force or threats. Watson emphasizes that without his stipulation to the fact that he and Moore had sexual intercourse the record would be unclear if any intercourse occurred at all. Watson further attacks the evidence as being scant and questionable with his comments that the rape kit did little to corroborate that there was forcible sex. Watson repeatedly contends that there was insufficient physical evidence that Moore was forcibly raped or that she acted out of fear. On the element of force, he argues that the evidence is not sufficient, credible, or substantial. However, when the evidence is viewed in the light of the appropriate standard, Watson's argument is clearly without merit.
¶ 37. First, as to Watson's assertion that Moore's testimony was unsubstantiated and uncorroborated, our case law clearly holds that the "unsupported word of the victim of a sex crime is sufficient to support a guilty verdict where that testimony is not discredited or contradicted by other credible evidence, especially if the conduct of the victim is consistent with the conduct of one who has been victimized *213 by a sex crime." Collier, 711 So.2d at 462(¶ 15). "A person may be found guilty of rape on the uncorroborated testimony of the prosecuting witness." Otis v. State, 418 So.2d 65, 67 (Miss.1982). The supreme court has not only recognized as corroborating evidence the victim's physical and mental condition after the incident, but the fact that she immediately reported the rape as well. Collier, 711 So.2d at 462(¶ 15).
¶ 38. Moore's mental state following the rape was consistent with the conduct of someone who had been raped. Moore's boss described Moore as looking "crazy" when she returned to the hair salon. Moore told her boss about the rape. Her boss took her to the hospital for a medical analysis. The police were called. This activity is indicative of a rape having occurred.
¶ 39. Watson categorically denies that he forced Moore to have intercourse with him and maintains that this is a case of his word against her word. Watson insists that Moore's testimony stretches credulity. Moore fervently maintained in her testimony that she did not agree to have sex with Watson and that the intercourse was against her will. She testified that she struggled with Watson but that he pushed her to the floor and threatened her. Although there were few small signs of external injury and no sperm was found, the presence of either is not considered absolutely determinative of rape. "The rule is that physical force on the part of the assailant, or physical resistance on the part of the victim, is not necessary if the proof shows beyond a reasonable doubt that the female surrendered because of fear arising out of a reasonable apprehension of great bodily harm." Davis v. State, 406 So.2d 795, 801 (Miss.1981) (citing Fields v. State, 293 So.2d 430, 432 (Miss.1974)). The testimony of Moore evidenced a reasonable apprehension of bodily harm.
¶ 40. It is the jury's duty to weigh conflicting testimony and witness credibility. Gandy v. State, 373 So.2d 1042, 1045 (Miss.1979). Juries are empaneled to resolve questions of fact. We will not substitute our factual findings for that of the jury in a contest of credibility. The conflict between the testimony of Watson and Moore was properly resolved by the jury. Collier, 711 So.2d at 462 (¶ 18).
¶ 41. This contention of Watson is without merit.
¶ 42.THE JUDGMENT OF THE CIRCUIT COURT OF HARRISON COUNTY OF CONVICTION OF RAPE AND SENTENCE OF TWELVE YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO HARRISON COUNTY.
McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., BRIDGES, THOMAS, LEE, MYERS, CHANDLER AND GRIFFIS, JJ., CONCUR.
NOTES
[1] The victim's name has been changed to protect her identity.